**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FIRST TERMITE CONTROL CO., INC., Respondent.**

No. 80–7142.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1981.

Decided May 29, 1981.

As Amended Aug. 5, 1981.

Mendelssohn McLean, Washington, D. C., for petitioner.

Richard J. Perez, Lempres & Wulfsberg, Oakland, Cal., for respondent.

Before PREGERSON, ALARCON, NELSON, Circuit Judges.

ALARCON, Circuit Judge:

The National Labor Relations Board (NLRB) has applied for enforcement of its order requiring First Termite Control Co. (Termite) to cease and desist in unfair labor practices. The NLRB failed to establish the jurisdictional requirement of interstate commerce by admissible evidence. We must deny the enforcement order.

### FACTS

Termite, an Oakland, California, company, provides termite and pest control services to private residences. Five percent of Termite's customers are individual home owners who directly contact the company. The remaining 95 percent of Termite's business comes from real estate agents who contact Termite on behalf of their clients.

The specifics of the unfair labor practices alleged here are irrelevant to our disposition. It is sufficient to note that unfair labor practice proceedings were instituted by the NLRB. In a hearing before an administrative law judge (ALJ), it was found that Termite violated § 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), by discharging a number of employees for engaging in protected concerted activity. The ALJ issued an order requiring Termite to cease and desist from unfair labor practices. The order also required Termite to offer the discharged employees full and immediate reinstatement in their former jobs, or in substantially equivalent jobs if those jobs no longer existed. The Board affirmed.

Termite contends that the enforcement order should be denied because: (1) the evidence used to establish the jurisdictional requisite of interstate commerce was improperly admitted; (2) the retail business standard was improperly applied to Termite; and (3) the order requiring Termite to offer reinstatement was improper. Our disposition of the first issue makes it unnecessary for us to reach the other two issues.

### ADMISSIBILITY OF EVIDENCE

Under the NLRA, the NLRB has jurisdiction over all cases "affecting commerce." 29 U.S.C. § 160(a). To satisfy this statutory standard, it must be shown that the business in question generates an amount of interstate commerce that rises above the level of "de minimis." *NLRB v. Fainblatt*, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014 (1939).

To establish the necessary amount of interstate commerce, the NLRB introduced the following evidence: From May 1978 through May 1979, Termite bought approximately $20,000 worth of Douglas Fir Lumber from Economy Lumber Co. (Economy),

a California company. During that period, Economy purchased over $1 million of Douglas Fir lumber. The NLRB introduced a freight bill to prove that a substantial amount of the lumber purchased by Economy came from outside California.[1] The bill showed that a shipment of lumber delivered to Economy in California originated in the State of Washington.

The freight bill was prepared by Southern Pacific Railroad. The custodian of records for Southern Pacific, however, was not called as a witness. Instead, the NLRB called Economy's bookkeeper as a witness. The bookkeeper testified that she had received the freight bill, and that she had paid it. No other witnesses were called to support the admission of the freight bill.

Termite objected to the introduction of the freight bill on grounds of hearsay. The ALJ overruled the objection, and held that the freight bill was admissible under the business records exception to the hearsay rule. Fed.R.Evid. 803(6).[2]

Rule 803(6) provides that: "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness" are not excluded by the hearsay prohibition.

■ It cannot be contested that the challenged statement is in fact hearsay. The NLRB sought to introduce a writing that stated lumber came from Washington to California in order to prove the truth of that statement. See Fed.R.Evid. 801(c). The statement would, however, be properly admissible if it fell within the 803(6) exception.

Termite contends that the requirements of Rule 803(6) were not met because the authenticating witness was an employee of Economy, and not of Southern Pacific, the entity that prepared the challenged record. Thus, the witness had no knowledge of the circumstances under which the records were prepared. Termite claims that 803(6) is not satisfied unless the witness has knowledge of both the making and keeping of the records sought to be introduced. Moreover, Termite contends that the witness must be able to testify that the record was made and kept in the ordinary course of the business' activity. In essence, Termite contends that Economy's bookkeeper did not satisfy the "custodian of records or other qualified witness" criterion of 803(6).

The NLRB responds that under 803(6) it is not necessary that the witness have knowledge of the preparation of the record. It is sufficient if the records "have all the indicia of trustworthiness that the federal rules require for the admission of hearsay evidence." (Citing *United States v. Ullrich*, 580 F.2d 765 (5th Cir. 1978).)

■ A traditional explanation for the exclusion of hearsay evidence is that it deprives the opposing party of the opportunity for cross-examination. The declarant is not present and thus cannot be cross-examined. On the other hand, the witness who is present and testifying to the hearsay does not have any personal knowledge of the hearsay on which testimony is sought, and therefore cannot be cross-examined in a meaningful manner. See 4 J. Weinstein &

---

1. The parties entered into a stipulation by which much of the above information was admitted. Termite, however, did not stipulate to the existence of an interstate commerce nexus.

2. 29 U.S.C. § 160(b) provides that "so far as practicable [proceedings before the NLRB shall] be conducted in accordance with the rules of evidence applicable in the district courts of the United States...." See 29 CFR §§ 101.10(a), 102.39 (1980). The parties do not contend that the use of the rules of evidence was not practicable in this case.

M. Berger, Weinstein's Evidence ¶ 800[01] at 10–11.[3]

■ Despite the inability to cross-examine, a business records exception to the hearsay rule has been incorporated into Anglo-American law for a substantial period.[4] The modern theory behind this exception is that business records have a special indicia of reliability. *See* Fed.R.Evid. 803, Notes of Advisory Committee on Proposed Rules:

> The element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."

■ The provision in the rule that requires that the record be supported by "the testimony of the custodian or other qualified witness" insures the presence of some individual at trial who can testify to the methods of keeping the information. If the witness is not knowledgeable as to the manner in which the records are made and kept, he or she cannot be subjected to meaningful cross-examination. Without cross-examination on the keeping of the records, the trier of fact would have no rational basis on which to evaluate the accuracy of the record, and therefore the trustworthiness of the evidence. Thus, "[t]he testimony of the custodian or other qualified witness who can explain the record-keeping of his organization is ordinarily essential." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 803(6)[02] at 151–52.[5]

The bookkeeper from Economy had no knowledge of how Southern Pacific's records were made or maintained. She testified that she received a freight bill from Southern Pacific for a shipment of lumber and that she made payment on the bill. At best the freight bill seemed to corroborate her testimony that she paid for a shipment of lumber. The freight bill, however, was offered to prove the lumber was shipped from Washington to California. The record is briefly quoted below:

> Q: [by Termite's counsel]: For those purposes, that is for Economy's purposes of determining whether or not the bill has been paid. It's of no interest to Economy, is it, where this document says the shipment had originated?

---

**3.** Cross-examination is "a 'vital feature' of the Anglo-American system. Certainly cross-examination sheds light on the witness perception, memory and narration. It can expose inconsistencies, incompletenesses, and inaccuracies in his testimony." 4 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 800[01] at 10–11. *See also* 5 J. Wigmore, Wigmore on Evidence § 1367 at 32 (cross-examination "is beyond any doubt the greatest legal engine ever invented for the discovery of truth").

**4.** Beginning in the 1600's a practice developed in England by which the "shop books" of tradesmen and craftsmen were admissible as evidence of debts. The rules prohibited a party from being a witness. This rule, therefore, developed as a necessity, as well as a rule of convenience, being the only way to prove debts. Abuses in this rule led to a number of statutory limitations.

In the 1700's an alternate, but broader, doctrine developed in English common law courts. This rule after some expansion, permitted use of all entries made by a person, since deceased, if made in the ordinary course of business.

The rule developed somewhat unevenly in America. By the 1800's, however, an American equivalent to the English regular business entries exception began to emerge. Rule 803(6) simply represents a later, more relaxed, codification of the English rules. *See generally* J. Weinstein & M. Berger, 4 Weinstein's Evidence ¶ 803(6)[01]; 5 Wigmore on Evidence, Evidence §§ 1517–1518 (4th Ed.1974).

**5.** That the drafters of the rule intended to require that the introducing witness have knowledge of the making, keeping and maintaining of the documents is clearly established by the Notes of the Committee on the Judiciary, Senate Report No. 93–1277. Note to paragraph (6). "A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge, e. g., in the case of the content of a shipment of goods, upon a report from the company's receiving agent or in the case of a computer print-out, upon a report from the company's computer programer or *one who has knowledge of the particular record system....*" (emphasis added)

A: No.

Q: That's of total indifference to you?

A: No.

Q: So when you're concerned about the accuracy of the document, it's only insofar as it relates to the amount on there and the particular shipment it relates to, is that right?

A: That's right.

Q: So whether or not there's an error on the origination point, would not make any difference to you, is that correct?

A: I don't understand what you're—

Q: Okay.

This particular document says, Washington. You don't check on that to see if that's correct, do you?

A: No, no. The lumber is milled, if it says Washington, the lumber is milled in Washington as is set forth on the train [sic].

Q: Let me ask you this. That's the assumption you make from the document itself, is that right?

A: Well, this is the assumption that we're getting from our broker, that it's coming from a certain original point.

.      .      .      .      .

Q: So for Economy Lumber's record keeping purposes, this bill of lading is important to you insofar as it states a dollar amount?

A: That's right.

.      .      .      .      .

Q: You don't know when this bill of lading is prepared, do you?

A: No, I don't.

.      .      .      .      .

JUDGE WELLS: Does the amount [of the freight bill] vary in terms of where it comes from?

A: I don't know. I really couldn't—I couldn't answer that.

Q: [by NLRB counsel]: So you can't know if the same amount of weight shipped from Washington would cost the same as shipped from say Sacramento?

A: I—I couldn't answer that. All I know is there's a set rate the Southern Pacific has for freight.

■ It is clear from the foregoing that the witness from Economy had no knowledge as to how the records were prepared nor any knowledge as to the manner in which factual information was placed in the records kept by Southern Pacific. Moreover, the record indicates no reason for the witness to be interested in the accuracy of the records as far as they refer to the place of origin of the lumber.

The NLRB contends, nonetheless, that *United States v. Pfeiffer*, 539 F.2d 668, 671 (8th Cir. 1976), *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977), and *United States v. Ullrich*, 580 F.2d 765 (5th Cir. 1978), would permit the admission of the challenged freight bills. These cases are factually distinguishable.

In *United States v. Pfeiffer* the prosecution introduced records prepared by a common carrier through the testimony of an employee of the shipper. The Eighth Circuit held this was proper:

> According to [the employee-witness] these invoices were delivery receipts which were prepared from the [shipper's] bill of lading by the common carrier taking the shipment away from the ... plant. He stated that the carriers got paid on those freight bills, so they had to be correct in the weight and number of pieces, the freight charges, and the bill of lading number shown on that document.... [The shipper] relied on these records prepared by other companies. Although [the employee-witness] had no actual knowledge about the circumstances surrounding their preparation, he was familiar with these shipping invoices and the same delivery slips were checked by [the employee-witness] against [the shipper's] bills of lading for accuracy and proper freight payments. [The employee-witness] was familiar with all of these procedures and the records demonstrate a circumstantial guarantee of trustworthiness.

539 F.2d at 671.

In contrast to the employee-witness in *Pfeiffer*, the witness in the present case

was unable to demonstrate any familiarity with the procedures used by Southern Pacific in making the records, had not checked the records for accuracy, and did not rely on the information in the records as to the lumber's place of origin.

In *United States v. Flom*, the prosecution introduced invoices prepared by one company through the testimony of an employee of a second company, in whose files the records were found. In a cursory manner, the Fifth Circuit approved this practice, noting that "[a]lthough the usual case involves an employee of the preparing business laying the necessary foundation under 803(6), the law is clear that under circumstances which demonstrate trustworthiness it is not necessary that the one who kept the record, or even had supervision over their preparation, testify...." 558 F.2d at 1182.

The Fifth Circuit unfortunately did not delineate the circumstances which illustrated trustworthiness. The record before us does not contain any circumstances that would demonstrate trustworthiness as to the place of origin of the shipment of lumber. There is simply no testimony regarding the preparation of these records.

In *United States v. Ullrich*, the prosecution introduced records to prove the identity of an automobile through to testimony of an employee of an automobile dealership. The records were prepared by an automobile manufacturer and a credit agency, and sent to the dealership. The Fifth Circuit held that their introduction was proper. "Although these documents were furnished originally from other sources, [the employee-witness] testified that they were kept in the regular course of the dealership's business. In effect, they were integrated into the records of the dealership and were used by it." 580 F.2d at 771.

The *Ullrich* court also noted the existence of mechanisms in the record keeping system that insured accuracy, testified to by the employee-witness. In the instant case, there was no testimony to indicate Economy relied on the information in the records relating to the origin of the lumber. Moreover, there was no evidence of mechanisms that would insure accuracy.

The NLRB also relies on *United States v. Olivo*, 278 F.2d 415 (3d Cir. 1960), a case arising under the since repealed Business Records Act. This reliance is unjustified. In *Olivo*, the offered records were prepared by the Illinois branch of a company, and introduced by the testimony of an employee of the New Jersey branch of the same company. In contrast, in the instant case, the business records of one entity, Southern Pacific, were introduced through the testimony of an employee of a second entity, Economy. This is obviously distinguishable from the single entity involved in *Olivo*.

We are not called upon here to determine whether the reasoning employed by the other circuits in deciding the above cases is sound. It is sufficient to note that none of the above cases provides a basis for holding that Economy's bookkeeper satisfied 803(6)'s requirement that business records be supported by the testimony of the custodian of records or other qualified witness. In the cases cited by the NLRB, the businesses in whose files the records were located had a substantial interest in the accuracy of the portion of the records at issue. In contrast, Economy was indifferent as to the origin of this lumber, and had no interest in the accuracy of that portion of the freight bill.[6]

Economy's bookkeeper is not the custodian of records or other qualified witness,

---

**6.** The Ninth Circuit has not before had occasion to interpret the need under Rule 803(6) to have as a witness an employee of the business that made the records. Under the old Business Records Act (28 U.S.C. § 1732 (1958)) (superseded), this Court discussed the exclusion of certain documents as not being business records within the meaning of the old business records exception. This Court stated that the records "were not made in the regular course of the business of the company in whose files they were found—a showing which must be made to give application to the Business Records Act", and thus noted that the documents were excludable. *Phillips v. United States*, 356 F.2d 297, 307 (9th Cir. 1965), *cert. denied, sub nom. Walker v. United States*, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966). The continued validity of the *Phillips* rationale under Rule 803(6) is unclear.

as required by 803(6). Southern Pacific's records are inadmissible hearsay. Thus, the jurisdictional requirement of interstate commerce has not been established. We must deny enforcement of the NLRB's order.

Termite further contends that enforcement of the NLRB's order must be denied because the "retail enterprise" standard was improperly applied and because it has already offered reinstatement to the employees in question. Our refusal to order enforcement on the jurisdiction question renders these issues moot.

The application for an enforcement order is DENIED. The case is remanded to enable the Board to order the record reopened for the taking of further evidence.

Judgment is hereby entered in accordance with the Opinion as amended.